Your Honor, in this case on the docket, 2-17-0693, Henry Swanson and Laurie Swanson, plaintiff's appellants, v. Consolidated School District 158 F.L., defendant's appellate. On behalf of the plaintiff's appellants, Mr. Michael P. Pullen. On behalf of the defendant's appellate, Mr. William F. Ducey. Good morning, counsel. Mr. Pullen. Please, the court, counsel. Good morning again, Your Honors. Michael Pullen on behalf of the appellant plaintiff in this matter. The issues involved in this appeal are twofold. Number one, whether the trial court erred in granting summary judgment as to the school district and its employees and finding that sections 26105 and 26106A of the Illinois Local Governmental Tort Immunity Act applied to these facts. The second issue is simply whether or not the trial court erred in finding that the plaintiff did not present facts from which a reasonable jury could find that the school district and its employees' conduct rose to the level of willful and wanton misconduct. On both of those issues, plaintiff appellant believes the trial court did err. As to the issue of the immunities, Your Honors.  Counsel, you argue, I think it's your position, that the defendants are not immune under the Tort Immunity Act as you are not alleging a failure to diagnose a concussion, but rather failure to follow a concussion protocol. But doesn't the concussion protocol require that there actually be a concussion or one be identified? I don't believe so, Your Honor. The concussion protocol in place at the Huntley High School was the concussion protocol issued by the Illinois High School Athletic Association and the National Federation of High School Associations. That protocol essentially put in place ability for the coaches, teachers, et cetera, athletic directors, to be educated on what to look for when suspecting a concussion. They did not have, the policy or the protocol requires that if a concussion is suspected or should be suspected, that that student-athlete be cleared to return to play by either an athletic trainer or medical physician. It does not require that the athlete actually have a concussion, simply that the circumstances by which the student-athlete was injured gave rise to a suspicion that there could be a head injury and action on behalf of the school, in this case the coaches, should have been to have that student-athlete, in this case Ms. Swanson, be seen by either an athletic trainer or director to be seen by a physician outside of the school prior to allowing her to return to participation in their practice or competitions. It did not require a diagnosis from anybody in the school itself, simply that they recognized that the situation gave rise to a suspicion that this student-athlete may have sustained a concussion and to take action from there. Similarly, with regard to, so that's the immunity you set forth in 6106A. The school board also alleged that they're immune from liability due to the immunity in 6105, which is slightly different. In 6105, the immunity states that the local public entity is immune from a failure to make a physical or mental examination or to make an adequate physical or mental examination for the purposes of determining whether a person has a disease. That's the key phrase in that statute. So you don't feel that's applicable here because of the protocol for the concussion? Correct. Now, your opponent relies on the Abuzi case. How do you distinguish the Abuzi case from the facts here? That was when the EMS went in? Yeah, I was just trying to refresh my recollection of which case that was. So in the Abuzi case or Abuzo case, the EMS is in a different position than a student or a teacher. The EMS's purpose in responding to a call is to render medical care. Granted, it's first responder medical care. It's not the position of a doctor or a nurse. However, they have an obligation to examine a patient and determine whether emergency medical care is needed. It's not the same as the students or the coaches with regard to a student-athlete. They merely are educated to put in a position where they are charged with the task of recognizing the possibility or suspicion that a student-athlete may have had a head injury and taking action therefrom. The EMS in Abuzo failed to transport a child into a hospital, essentially failed to evaluate, which is what they're required to do, and failed to assess and determine whether that child needed to go to an emergency room or seek emergency medical care. Isn't basically that's what happened here, though, is a failure to assess whether or not there was a concussion? And wouldn't that make them immune? Because in the Abuzi case, the only reason that the Supreme Court found that they were liable was because they went under the Emergency Medical Services Act as opposed to... I think the distinction is simply that the situation here isn't that the coaches or school staff had to evaluate to determine whether or not this student had a concussion. It's that based on the education, based on the training provided by the National Federation of High School Associations, the Illinois High School Athletic Association, and information provided by the CDC of when to suspect a concussion, it moved that situation from being something that may have otherwise been latent to an average person. So based upon the concussion protocol is what you're saying? Yes, based upon the concussion protocol, those coaches were charged with the task of recognizing concussions and were armed with the education needed to make that assessment and take something that may have been latent to you or me and makes it what should have been obvious to them. The mere fact that you have a student athlete who falls and strikes her head by her own testimony was either dazed or unconscious for a minute or a minute and a half, and then subsequently has two more falls where she had a head strike, that in and of itself for any one of those three, but certainly combined, should have been obvious that this student potentially sustained a head injury. Had they been aware of that, the fact that she had fallen? The school was aware of the fact that she had fallen. That was the allegation. Yes, and I don't think that it's disputed that Kelly Swanson fell at practice, and according to her own testimony, the coaches were present, and with regard to at least the first and third fall, readily apparent that she fell. The teammate of Kelly also testified that the coaches, that specifically Ms. Hoffman was present, was aware of all three falls and took virtually no action in securing, and even getting an athletic trainer to look at Ms. Swanson for any of the falls. So the immunities in 105 and 106 simply don't apply because the school is not charged with the task of making an examination for the purposes of determining whether a person has a disease or diagnosing that disease. In fact, the protocol in place and the policy in place at the high school aims at removing that responsibility from the coaches because it puts that responsibility of diagnosis and examination on qualified either medical personnel or athletic training personnel. It gives the coaches the ability to say, hey, this is a situation that this student may have sustained a head injury and needs to be checked out because of the seriousness of the head injury. So in and of itself, the policy shifts that examination and that diagnosis to somebody who's qualified to make that and puts the coaches in a position where they only have to recognize the potential or the suspicion that a head injury was sustained. And here, the staff at Huntley High School, and specifically Ms. Hoffman, failed to use that education and recognize the significance of the three falls, of any one of the three falls for that matter, and to follow that protocol in getting Ms. Swanson to an athletic trainer or directing a doctor for her to have an examination by a doctor prior to letting her return to practice or participation. I'm going to go back to one issue that you raised, and I think what you said was, you know, they see a child hit their head and they look dazed or their eyes are glassy or whatever it is. Isn't it, doesn't the policy, the policy really doesn't even require that, does it? Doesn't the policy just require that there was a head, somebody hit their head, that they don't even have to examine them and determine whether or not they look like they were concussed? Correct. The policy itself is vague in the sense that it doesn't require any specific set of symptoms for it to apply. It simply requires that a coach or athletic trainer or teacher or whoever is in the position of being present during the injury use the knowledge and education that they were provided and recognize that this is a situation that this student athlete may have sustained a head injury. And then the next step in the protocol, absent anything else, is to get that student athlete examined by an athletic trainer or get clearance by a medical physician. And this is, the position that the plaintiff appellee takes in this case, the appellant, sorry, takes in this case is consistent with what the legislature later did. And while we're not taking the position that the statute applies in this case, it's certainly instructive. In 2014, the Illinois legislature enacted laws requiring concussion education for coaches, teachers, game officials, and the like. And then in 2015, they amended that statute to essentially put in place the same protocol that's at issue in this case. The 2015 enactment requires that a student athlete be removed from practice or competition when a coach, physician, game official, athletic trainer, student, or parent suspects that the student athlete may have sustained a concussion or head injury and does not allow that student athlete to return to play until various requirements are met, including an evaluation of that student athlete by either a medical doctor or an athletic trainer. This is strikingly similar to the protocol that was in place at Huntley High School in 2010. If the immunities in 6105 and 6106A were to apply to this case, it would also apply to any case that comes hereafter and immunize schools from their failure to carry out what is now required of them under Illinois law. And removing the teeth of that statute, because there is no, in the statute itself, there is no penalty for failing to follow it, but allowing student schools to be immune for failing to follow that statute essentially makes it of no consequence whether they follow it or not. Would it still be a willful remand? That's what I was going to ask about. So that's, I guess, a little clarification on your question. Are you asking would this situation be willful wanton? Right. Okay. So in this situation, I believe that the plaintiff has set forth sufficient facts that a reasonable jury could find willful wanton conduct. Well, but here they did ask, the coaches did ask if she was okay. That isn't utter indifference, is it? I mean, maybe it might have been inadvertent conduct, but how would it be utter indifference and thus willful and wanton? I mean. So if that were the only fact that existed, that they asked her if she was okay and taken in a vacuum, I would agree with you that that's not utter indifference or conscious disregard. However, here it is not the student athlete who is charged with the task of determining whether or not they were injured. It's the coaches, the teachers, the game officials, the athletic trainers, who are the adults who have received the education pursuant to the protocol, pursuant to CDC, the NFHSA, the Illinois High School Athletic Association, that are in the best position and are charged with the responsibility to determine whether or not that student athlete has sustained a potential head injury or suspected potential head injury. Asking a 13-year-old girl who wants to cheerlead whether she's okay after she hurt her, after she initially struck her head, has little significance in the coach's actions. Well, her parents, though, did seek a medical opinion after one of the falls and determined that the doctor determined she didn't have a concussion. You're correct. After the first fall, about four days later, I believe, Ms. Swanson was taken to a doctor who saw her, and that doctor screamed her and determined that he didn't feel that she had a concussion. While concussions in and of themselves are hard to diagnose, they're even harder to diagnose as time passes. So whether or not a physician would have arrived at that same conclusion had she been seen the day of or the day after, I can't say. But it also doesn't excuse the second and third instances where Kelly fell and struck her head on the mat, and no medical attention was sought because the school didn't contact the athletic trainer, who wasn't in the building for that matter, and didn't tell Kelly or her parents to go get her checked out by a medical physician. They simply allowed her to return to practice, and for the third fall it wasn't until Kelly removed herself from the competition and sat on the bench with an ice pack on her head that she was at all removed from participation at all. I need nothing. Thank you. Thank you very much. We don't have time for rebuttal. Mr. Gleason. Good morning. Good morning, Your Honors, and may it please the Court and Counsel, my name is William Gleason, and I represent the defendants at police in this case. Your Honor, the defendants are immune in this case from the injuries that are issued here based upon sections 6-105A and 6-106 of the Illinois Tort Immunity Act. And even if they weren't absolutely immune under those statutes, the plaintiffs are not immune. sufficient facts to warrant a trial on whether their conduct was willful in line, which is the necessary standard that's needed to be reached here. I thought one of the highlights of Counsel's statements before, Your Honors, was that it's really hard to diagnose a concussion, yet he's asking to impose a standard on school teachers and coaches of being able to diagnose. He's talking about protocol, not diagnosis. Well, that's Counsel's argument, Your Honor, but I don't see how you can divorce the protocol from your... Because the protocol says if it's suspected, not if it's diagnosed. It's if a concussion is suspected, though. It's requiring you to think and diagnose by viewing somebody, whether what they're showing you leads you to the conclusion that they may have a concussion. But isn't part of that knowing or observing a kid fall and hit their head? Well... Shouldn't that be part of what is considered when determining whether there's a basis to suspect? I think all the facts are part of what the coaches are looking at, but what the facts are here, Your Honor, is that the coaches didn't actually observe the fall. They became aware that the student fell, but they weren't aware that she had hit her head. Even in their statement of facts before the courts here on pages 8, 9, and 10, they fault the defendants for failing to ask the student if she hit her head. So they didn't actually know that she hit her head, and that's in the statement of facts that we set forth. But didn't the high school undertake a duty to comply with this concussion management treatment? I don't believe so, Your Honor. The statute that Counsel referenced wasn't in play. What was in play was a rule from the National Federation of High School Associations, which is set forth in the papers and briefs before Your Honors. And when you look at that policy actually very specifically, it applies to game officials. It didn't even apply to coaches on its face. And in their brief, on page 5 of their brief, they concede that the high school had no written policy in place for the 2010 and 2011 school year. But the National Federation of High School required that if they exhibit signs, symptoms, and behaviors consistent with a concussion, meaning that you had to look at the signs, symptoms, and then determine that they were consistent with a concussion, then the protocol came into play. So it unquestionably requires you to be diagnosing something from the signs and symptoms that you're saying. And only once you become of the mind that a concussion exists does the protocol come into play. And that's almost exactly kind of the facts that are before the Supreme Court in Abruzzo or before the First District in Grandolski. And in Grandolski, they were observing a student who complained of general pain. And in that case, the First District determined that the school district was absolutely immune under 6105 and 6106A because they were trying to look at a complaint of pain and then make a determination as to what you are supposed to do based upon the complaint of pain. And in that case, the allegation was, of course, that they should have contacted emergency medical services. Whereas here, the complaint is, well, they should have known to take her out and have her seek medical attention. But based upon what the definition of a diagnosis is, based upon the Michigan Avenue National Pain Case, which is an act of identifying a disease or a physical or mental condition, I think those parts were left out of the statute by counsel when he presented the report. But it's not just a disease. It's also a physical or a mental condition, which I think is pretty clear that a concussion would be. Once that is what the failure is, the immunity comes into play. But if the coaches would have believed that she suffered a concussion, then they would have had obligations under the policy that even the new one under state law now, but it's undisputed that none of the coaches thought that she had a serious medical issue, that none of the coaches believed that she had a concussion. So that's undisputed. There's not a material question of fact with respect to that? Absolutely not, Your Honor. None of those coaches believed that she had a serious injury. The allegation is that they should have understood that she had a serious injury, not that they knew she had a serious injury and just wholesalely failed to act. Is that how you distinguish Grant? Well, I would distinguish Grant in two ways, Your Honor. First of all, I'm not sure Grant necessarily survives a bruise, though, because the facts in a bruise were that they were told that the person was unconscious and was not breathing and was a drug addict and they did absolutely nothing. And the Supreme Court said that's by the plain language of 6105 and 6106A within the contours of the statute. So I'm not sure if Grant survives it. But I think in Grant, what the 3rd District was looking at there was they were saying whatever the issue is, it's very plainly and out there. The student intends to commit suicide. You're told that. You don't need to evaluate whether it's true or not. You're sitting there saying somebody's going to kill themselves, and what do you do? And what they also said is the Alvarez v. Reach case, which is a Northern District case, which, of course, isn't binding. But even if you wanted to look down that path, the court there kind of split out those injuries that you can just see them because they're right in front of you, you're bleeding on the floor, as opposed to something that requires you to dig a little bit deeper, like a post-head injury. So even under the facts of those cases, Grant, I believe that the immunities under 6105 and 6106A would apply. And even when you look at the plaintiff's briefs before the circuit court in this case, their criticism was that we, quote-unquote, failed to recognize concussion symptoms. That's what they were saying we did wrong. So that requires an exam. Correct that, because it seems to me to be axiomatic that if you're going to analyze whether somebody has concussion symptoms, you need to observe them and determine whether or not they have issues going on. And then you need to make the next step of saying, do these things that I'm observing lead me to a conclusion that this type of physical or mental condition exists? Is an observance an exam? Absolutely. It's an examination. But Kelly did share with her coach that she had some of the traditional signs of a concussion. I mean, she had vomited, she had bad headaches, she had, I believe, some vision issues, memory problems. She shared some of that, at least, with her coach at one point. Your Honor, what the facts will demonstrate and what are in the record is that there was three falls. And after the first fall, they asked her if she was okay. She told them that she was fine. She told them that she did not tell them anything about headaches, vision, nausea, dizziness, or numbness. She testified that she did not tell them any of that. And she further testified that she wasn't suffering from any of those conditions while she was at school on that particular day with respect to the November 18, 2010 fall. With respect to the November 30, 2010 fall, she fell. They asked her if she was okay. She told them, quote, unquote, I feel fine. But should they rely on the reporting of a child? I mean, let's take Kelly out of this and let's look at a freshman football game. I mean, and the guy comes out of a play and the coach looks at him and says, Are you okay? What do you think a 15-year-old boy is going to say who wants to play football? Yeah, Coach, I'm great. Put me in. Should we rely on the reporting of a 14, 15, you know, 13, whatever age it is, a minor? I think that their reports have to play into part of what the coaches are allowed to look at. But it shouldn't be the end all, should it? Absolutely not, Your Honor. It's not the end all, be all. They're still looking at the student. But here, the facts from Kelly, even after the second fall, are once again, she didn't tell them that she had any of these other symptoms. They certainly didn't observe any of these other symptoms. And she testified that she wasn't suffering from any of those symptoms. But they witnessed her hit her head. No, Your Honor. The testimony is that they didn't observe her fall. They knew that she fell because when the students fall, then they go over. But they didn't actually observe her head hit the mat. And not that that makes the end all, be all, but I think that's part of the factual record that's before the court. But, I mean, they knew the position she was in. She was in the top position. They were familiar with the distances. You know, she wasn't one of the support people who then fell over. She was the person, I've forgotten the exact word. She was the flyer. The flyer. Yes, Your Honor. Thank you. She was the flyer. So, I mean, shouldn't that knowledge, this is the coach. I think when you knew what the moves were. Sure, Your Honor. That they were supposed to be doing. The coaches all testified, I think, undisputedly, that there are different types of falls in cheerleading. And there was the type of fall that they mostly catch the students and they kind of all fall down together. And it's not usually a big deal this type of thing happens. In the cheerleading world, based upon the testimony of the coaches, which was undisputed, that there are falls of that nature. So, depending on how you define fall. But that's what they testified that they were most, that happened most of the time. And that's what they probably would have believed happened here. Because all of them testified under budget that they didn't think that she had ever suffered a serious injury. So, I see Your Honor's point, saying if I threw somebody 20 feet up in the air and let them crash down, everybody's going to know. So, it's all right if the coaches then just assume that when the kids fall down, that this is part of their routine. Well, I think you have to view it from the lens of what they're dealing with on a day-to-day basis. And in their experience, that's what they're dealing with. And these are high school students and they will tell them if there's an issue, the other kids will say something wrong. I mean, that's just their experience in life. That when these things happen, they look at the kid, they observe them, they determine whether or not there's a problem, and then they go from there. And when they observed her, they didn't think that she was seriously injured. She told them that she wasn't seriously injured. And she appeared to be okay to the coaches as they were dealing with her. Is it part of the coach's training, though, to understand that, as Justice Shastak pointed out, that kids are going to minimize any injury because they want to play or they want to go back into the routine? Other than the athletic trainer, I don't believe that any of the coaches testified that they were for sure aware that kids minimize their injuries. And I think they all testified that there were students who would bring things to their attention that required some type of care. Did any of the other cheerleaders mention that Kelly was complaining of being dizzy, headaches? I believe that Ms. Cabrera testified that her and Kelly had a conversation wherein Kelly complained of certain things. But what's undisputed in the record is that neither Kelly nor her parents advised the teachers or the coaches of those complaints. Didn't Kelly tell her coach? The only time Kelly complained of anything vis-à-vis a headache was after the third fall. She said, my head hurts a little bit, but I'm okay. And did they witness that fall? That was at the game, right? Correct. No, it's a little bit confusing. It was in a practice before the game in the hallway. And during the game, she said, I'm not feeling well. And she asked for an ice pack, which she placed onto her neck. So that was the only time she brought up anything that would have manifested some type of a physical injury. And the coach, once again, looked at her, observed her, and saw what was going on and did not think that she had suffered a serious injury. Were the coaches negligent or, you know, in not watching these girls at practice? Because it seems to me that the testimony was oftentimes that the coach wasn't right there and then came over later when the girl was down. I never saw her fall. What were they watching? The testimony, Your Honor, is that when the cheerleaders are practicing stunts of these natures, and I believe the ones that issue were called a liberty and a twist down, there would be groups of students. And so they would be kind of watching the groups. They were in the general vicinity, but they may not have been focused intently on one. They would be looking at one particular group while five to seven feet away from another group. And ostensibly, if you wanted to have a coach look at everyone, the only way they could run practice is to have only one group do the stunt with, I believe there was 15 to 20 girls on this team, or they would have to hire additional coaches to watch. So the coach is only five or seven feet away from these different groups?  Is that your position? That's the testimony. They didn't hear someone hit the mat? Well, they recognize that there's a fall because people go down and your attention gets turned when you see people on the ground, but they didn't hear any noises or sounds to them. Okay. That there's no testimony like that in the record. Even if they weren't absolutely aggrieved for failing to diagnose a concussion, we believe that the facts were... Just a second. Yes, Your Honor. I'm sorry. It's very distracting if there's conversation in the courtroom during the argument. We'd like to focus on the argument, so if you could refrain from conversation, please. Thank you, Your Honor. Go ahead. We do not believe that they demonstrated facts to show willful and wrong conduct. It's a matter of law. It's the court's law where that requires either an intent to injure, which is not an issue here, or utter indifference or conscious disregard for the student's safety. The coaches did not demonstrate utter indifference or conscious disregard for the student's safety. When there was information that they felt, they talked to her. They asked her what was going on. They tried to assess her. They tried to look at her, and they just determined that nothing was wrong. They weren't aware of any dangerous condition that was lingering out there, and I think that that's driven home by the way that the parents treated this student as well. They undeniably loved their daughter, and they had a lot more information than the coaches had. They brought her to get medical treatment. It was determined that she did not have a concussion. They never told the coaches that they sought medical treatment. They never told the coaches any of those types of information. These coaches were left in the dark with respect to Kelly having issues, and Your Honor brought up earlier that Kelly had informed them at some point that she had vomited, but both Kelly and her mother did testify, and it's very plain in the record that they testified that she had vomited because she had the flu, and I think that starts to highlight back into some of these symptoms. You need to tie them into it being related to a concussion because just saying, I told the coach that I vomited doesn't necessarily mean that they have a concussion because it could be from the flu, it could be from a headache, or all those other types of things. And for those reasons, Your Honor, we would ask that you affirm the order of the circuit court in granting summary judgment. Thank you for your time this morning. Thank you. Thank you very much, counsel. Mr. Holden. Your Honor, just a couple brief points I wanted to touch on from counsel's argument. Mr. Gleason pointed out that the origin of the policy or protocol in place at Huntley High School was from the National Federation of High School Associations. What he failed to acknowledge is that that policy or that procedure had been adopted by the Illinois High School Athletic Association, and by the testimony of Huntley High School's athletic director, Bruce Bloomer, he admitted that not only did he provide all of the education materials from the NFHSA and the ISHA, he also provided information from the CDC from a program called Heads Up to his coaches. Mr. Bloomer further testified that he expected his coaches to be familiar with this material and to be educated on how to recognize and when to recognize situations where student athletes may have suffered a head injury or a concussion. He also stated that he expected his coaches to follow the protocol in place by the NFHSA and the ISHA. So while the NFHSA may only mandate that for game officials, Bruce Bloomer, the athletic director, had that expectation that his coaches follow those same procedures to protect the student athlete from situations where they may have sustained a concussion. Does the record reflect that this particular high school had actually had training for the coaches, even though they had adopted the policy and passed out some written material? Yes. I believe Mr. Bloomer, as well as one if not more of the coaches, testified that they participated in online training for recognition of concussion syndromes, both as part of the school district's education and as part of maintaining their coaches' certification at the state of Illinois. So they had all been trained in this recognition of potential head injuries. So are you talking about the same year, excuse me, I'm sorry, as counsel did because he indicated there was no written policy in 2010-2011? There was no written policy promulgated by the high school. However, there was written policy promulgated by the NFHSA and adopted in writing by the Illinois State High School Athletic Association. So he was referring to there's no separate policy. You're saying the policy, it was a national policy and the state policy were adopted by the high school. Correct, and that's reflected in the athletic director's testimony. Thank you. And it's your position that by being in receipt of this policy, it takes them out toward immunity, the immunity? It does, but in addition, I believe the immunity is a part of the situation for the reasons I stated in both the briefs and my initial argument. Okay. Counsel then talked about the grant case, and I apologize, Your Honors, I forget the name of the case, but the case involving the young man who committed suicide at the school, as well as the Abruzzo case from here, the Alvarez case from the Northern District of Illinois. And what becomes clear in those cases is that the question is, the question central to those cases was whether the condition was latent or obvious. And here, the coaches were provided with the training required to take something that otherwise may have been latent to a layperson and make it obvious that this is a situation that this student athlete may have sustained a concussion. They weren't asked to diagnose. They weren't asked to examine. They were asked to be aware of the circumstances in which this injury occurred, and if there's any suspicion that this student athlete sustained a concussion or if there should have been any suspicion, that they needed to take the next step and have that student athlete examined by the athletic trainer or medical director. I'm sorry, medical doctor. And that's even underscored even more by the fact that the record indicates in this case from everyone that the athletic trainer, Lisa Nold, was on the premises of the high school. She wasn't in the gym at the time of the falls where they occurred, but she was a phone call or a radio page away. It wasn't some extraordinary effort that would have required by the school to get the athletic trainer into that gym to say, hey, take a look at Kelly. She may have hit her head. And it further wouldn't be any additional effort for the school to say, you need to be seen by a doctor before we let you return to practice. It's no additional cost to the school, as they wouldn't be expected to pay for the doctor, and it's no additional effort because the family would be the ones taking her to the doctor. Lastly, Your Honors, with regard to the willful and wanton, the case law in Illinois is clear that in the vast majority of circumstances, whether or not conduct rises to the willful and wanton standard is a question for the jury. And I concede that there are facts on both sides of that equation here. Counsel will argue many facts that he feels supports that there was not. I will argue facts that I feel support that there was. And it's for the jury to determine. I think there are sufficient facts in this record for that question to go to the jury. Thank you. Thank you very much, counsel. The court will take the matter under advisement and render a decision in due course. We stand in recess until the next case.